**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

CIVIL ACTION NO. 2:21-CV-061 (WOB-CJS)

VALLEYSCAPES, INC.,                                        PLAINTIFF,

VS.                    **MEMORANDUM OPINION AND ORDER**

DIVISIONS, INC.,                                        DEFENDANT.

This is a lawsuit brought by ValleyScapes, Inc. against Divisions, Inc. for breach of contract, unjust enrichment, and promissory estoppel stemming from snow and ice removal services provided by ValleyScapes for Divisions in February 2021. Currently before the Court are the parties' cross-motions for summary judgment and Defendant's motion to take additional discovery pursuant to Rule 56(d). (Doc. 32; Doc. 33; Doc. 35).

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.

***Factual and Procedural Background***

**A. The Parties' Contractual Relationship**

Plaintiff ValleyScapes is an Oregon-based company that provides landscaping and maintenance services, including snow removal services, for commercial customers and properties. (Doc. 33-1 at 3). Defendant Divisions is a Kentucky-based company that oversees property management and maintenance services for

1

thousands of commercial real estate locations in the United States, including in Oregon and Washington state. (*Id.*; Doc. 32-1 at 5). Divisions does not directly perform maintenance, but rather contracts with third-party vendors to provide services including landscaping and snow removal. (Doc. 32-1 at 5). Divisions entered into such an agreement with ValleyScapes beginning in 2017. (Doc. 33-1 at 3).

For several years, Divisions and ValleyScapes engaged in a mutually beneficial relationship whereby ValleyScapes performed various services for Divisions and Divisions paid ValleyScapes for its work. (Doc. 1 ¶ 8). The parties had a Master Provider Agreement ("MPA") and also entered into multiple subordinate Landscaping Service Agreements and Snow Removal Agreements that were specific to certain properties in Oregon. (Doc. 33-1 at 3-4).

During the parties' relationship, Divisions introduced an app called "In Position" and contracted vendors, including ValleyScapes, were thereafter expected to use the app's GPS feature to check in and out of work sites in order to enable Divisions to verify that the relevant work had actually been performed. (*Id.* at 8; Doc. 32-1 at 4). ValleyScapes contends that the app was prone to "freezing up" and that sometimes its technicians would work without using In Position, but that ValleyScapes "never got

penalized for not using the In Position app on our maintenance or any work." (Doc. 33-1 at 8; Doc. 28, Lowery Dep. at 97:14-98:8).

In early 2019, Divisions hired ValleyScapes to do emergency snow removal services in Bellingham, Washington, which was outside the scope of any existing Snow Service Agreement. (Doc. 33-1 at 8). ValleyScapes was not required to use In Position for those services. (*Id.* at 8-9). Divisions ultimately paid ValleyScapes for those services after ValleyScapes accommodated a request to discount its bills by five to seven percent. (*Id.* at 9; Doc. 28, Lowery Dep. at 85:15-86:9).

In June 2020, Divisions and ValleyScapes entered into a new Master Provider Agreement ("2020 MPA") which governed all subsequent transactions between the parties. (Doc. 32-1 at 6; Doc. 28-2). The 2020 MPA contemplated that the parties would enter into various "Service Agreements" for specific projects and provided that the "Contract Documents" would also include other communications such as purchase orders. (Doc. 28-2 at 2). Later in 2020, the parties entered into Snow Service Agreements for the 2020-2021 winter season regarding various commercial properties owned by Fred Meyer and Kimco Realty in Oregon. (Doc. 32-1 at 7). Notably, there were no Snow Service Agreements for any relevant Washington properties. (Doc. 33-1 at 4).

**B. Snow Removal Services in Oregon During Winter Storm Uri**

In February 2021, Winter Storm Uri caused historic snow and ice accumulations in the Pacific Northwest. (*Id.* at 9; Doc. 32-1 at 3). Divisions dispatched ValleyScapes to provide snow and ice removal services pursuant to existing Snow Service Agreements at several locations in Oregon (the "Oregon Locations").[1] (Doc. 32-1 at 8).

Divisions also claims that it issued purchase orders to ValleyScapes,[2] which contained additional requirements and instructions including that "[t]echnician[s] must check in and out using the In Position app," "[l]abor hours will be based off the number of hours on site (with no hour minimum) according to the In Position app," "[a] minimum of 4 before photos and 4 completion photos must be taken and uploaded via the In Position app," and "[i]f there are any issues checking in, checking out, or uploading

---

[1] The Oregon Locations include properties known as: Clackamas Promenade, Gresham Town Fair, Jantzen Beach, Milwaukie Marketplace, Oregon Trail Center, and Tanasbourne Village. (Doc. 32-1 at 7; Doc. 33-1 at 9).

[2] ValleyScapes argues that the purchase orders submitted by Divisions are not the purchase orders ValleyScapes actually received during Winter Storm Uri. (Doc. 38 at 3). ValleyScapes notes that the purchase orders are dated more than six weeks after the services were rendered and contain "not to exceed" price limits, which directly contradict the payment terms in the parties' Snow Service Agreements. (*Id.*; Doc. 38-1, Lowery Supp. Decl. ¶ 13). Divisions argues that the later date stamps were generated when Divisions re-issued those purchase orders in an attempt to verify ValleyScapes's work, but that the substantive terms of the purchase orders are the same as they were when originally issued. (Doc. 32-1 at 10 n.1; Doc. 32-5, Keel Decl. ¶ 5).

4

photos the technician must call Divisions and provide additional details . . . . Failure to do so will result in a cancelled job and non-payment." (Doc. 31-4 at 2, 7, 12, 17, 22, 27). The purchase orders also contained a page of specific instructions for using the In Position app. (*Id.* at 4, 9, 14, 19, 24, 29).

Divisions also ultimately hired secondary service providers to provide snow and ice removal at some of the Oregon locations because, in its opinion, ValleyScapes failed to perform its obligations adequately. (Doc. 34 at 25; Doc. 26, Shafer Dep. at 70:18-71:12). Divisions claims that ValleyScapes created "multiple massive safety issues" at the Oregon locations, including plowing snow so that it blocked entrances, stop signs, and handicap-accessible parking spots. (Doc. 26, Shafer Dep. at 72:3-8). Further, Divisions claims that ValleyScapes failed to remove snow from some parking lots, which prevented customers from being able to operate their businesses. (*Id.* at 72:14-20).

**C. Snow Removal Services in Washington During Winter Storm Uri**

Divisions also contracted with ValleyScapes to perform snow removal services in and around Tacoma, Washington, when the primary provider for those locations (the "Washington Locations")[3] failed

---

[3] The Washington Locations include properties known as: Grand Ridge, Inglewood, Klahanie, Pine Lake, Sammamish Highlands, and Fred Meyer #424. (Doc. 32-1 at 12; Doc. 33-1 at 10). Divisions notes that it already paid an invoice for work performed at a seventh location, Lowe's #2734, in Tacoma. (Doc. 34 at 16 n.3). ValleyScapes admits that it received payment

to provide adequate service during Winter Storm Uri. (Doc. 32-1 at 12; Doc. 33-1 at 9). There were no Snow Service Agreements for the Washington Locations, so the parties discussed billing over the phone and confirmed the rates via email, but provided that the 2020 MPA would govern the other terms of the arrangement. (Doc. 32-1 at 9; Doc. 33-1 at 10; Doc. 25-5 at 1-3).

Although Divisions now argues that it did not agree to pay for ValleyScapes's travel expenses, (*see* Doc. 32-1 at 12), it stated in its Answer in this case that it "agreed to pay for Plaintiff's verifiable travel expenses to and from Washington for [the Washington] services." (Doc. 7 ¶ 15). Further, Divisions claims that it issued purchase orders for the Washington Locations which contained the same language as the purchase orders for the Oregon Locations regarding use of the In Position app. (Doc. 32-1 at 12-13). However, ValleyScapes contends that it did not receive any purchase orders regarding the Washington Locations before or while services were performed there. (Doc. 33-1 at 10; Doc. 28, Lowery Dep. at 117:13-118:22; Doc. 31, Nielsen Dep. at 72:17-20).

### D. Billing Disputes Between the Parties

ValleyScapes subsequently sent invoices for the work it performed in both Oregon and Washington to Divisions for payment.

---

for the full amount of the Lowe's invoice on August 26, 2022. (Doc. 40 at 9 n.2).

(Doc. 32-1 at 10, 14; Doc. 33-1 at 12–13). However, the In Position logs for ValleyScapes's services contained errors, including the failure of technicians to check out after checking in on the app and the total time logged on the app was significantly less than the hours of labor ValleyScapes billed for.[4] (Doc. 32-1 at 10, 14–15; Doc. 32-2 at 6–11, 13–39). Further, the required photographs were not uploaded to In Position and ValleyScapes did not report or document any alleged issues it experienced with the app. (Doc. 34 at 18; Doc. 31, Nielsen Dep at 166:1–18).

On February 16, 2021, Divisions put a hold on ValleyScapes's account because it could not independently verify the charges billed in the invoices, meaning that it froze all contracts, invoices, payments, and bidding on jobs, including for services

---

[4] With respect to the Oregon Locations, ValleyScapes's invoices and In Position data logs note as follows: Clackamas Promenade: 320 hours billed, 83.19 hours logged; Gresham Town Fair: 375.5 hours billed, 143.05 hours logged; Jantzen Beach: 301.5 hours billed, 73.64 hours logged; Milwaukie Marketplace: 275.5 hours billed, 47.15 hours logged; Oregon Trail Center: 346 hours billed, 12.91 hours logged; and with respect to Tanasbourne Village: ValleyScapes billed for only 102 hours, but actually logged 115.89 hours (the logged hours for this location reflect over 48 hours of continuous work by one employee and 22.63 hours of continuous work followed by 25.81 hours of continuous work logged by another). (Doc. 28-9 at 2–7; Doc. 32-1 at 10–11; Doc. 32-2 at 6–11). With respect to the Washington Locations, ValleyScapes's invoices and In Position data logs note as follows: Grand Ridge: 94.5 hours billed, 6.11 hours logged; Inglewood: 9 hours billed, 4.34 hours logged; Klahanie: 12 hours billed, 0 hours logged; Pine Lake: 12.5 hours billed, 4.64 hours logged; Sammamish Highlands: 22 hours billed, 14.9 hours logged; and Fred Meyer #424: 7.5 hours billed, 0 hours logged. (Doc. 28-9 at 8–13; Doc. 32-1 at 14–15; Doc. 32-2 at 13–39).

unrelated to Winter Storm Uri. (Doc. 33-1 at 14; Doc. 33-3, Lowery Decl. ¶¶ 6-9; Doc. 25, Thibodeaux Dep. at 76:18-77:4).

ValleyScapes provided Divisions with maps, photographs, and data from the TSheets app, which is ValleyScapes's internal app for tracking its employees' hours, GPS location, and travel. (Doc. 33-1 at 7, 15; Doc. 28, Lowery Dep. at 299:13-300:6). However, the TSheets data also contains potential errors, including claims that employees worked more than 20 hours in a single day,[5] and the data contradicts ValleyScapes's own handwritten time recordings from the Washington Locations. (Doc. 34 at 13; Doc. 28-14 at 3-4; Doc. 29-9). Further, some TSheets maps show technicians potentially leaving the sites in question while they were supposedly working there.[6] (Doc. 34 at 14; Doc. 31, Nielsen Dep. at 269:7-25). TSheets can also be edited by ValleyScapes after data is entered by technicians. (Doc. 34 at 21; Doc. 31, Nielsen Dep. at 105:11-25).

ValleyScapes provided landscaping and snow removal services to Divisions through April 9, 2021, and thereafter terminated the contracts and business relationship between the parties. (Doc. 33-1 at 16; Doc. 33-3, Lowery Decl. ¶ 13). In the time since, Divisions

---

[5] ValleyScapes has also provided other TSheets data reflecting that the longest shift worked by a ValleyScapes technician during the relevant period was 11.75 hours. (Doc. 38 at 10; Doc. 38-1 at 16-28).

[6] ValleyScapes contends that its technicians can only check in and out on TSheets when they are physically located at the relevant site. (Doc. 38 at 10; Doc. 38-1, Lowery Supp. Decl. ¶¶ 3-4). However, this does not address the issue of technicians potentially leaving the site while remaining "checked in."

paid ValleyScapes for undisputed landscaping invoices. (Doc. 34 at 16). However, ValleyScapes claims that it is still owed $463,382.10 in outstanding invoices. (Doc. 33-1 at 16). On May 12, 2021, ValleyScapes filed this suit, alleging breach of contract, unjust enrichment, and promissory estoppel. (*See* Doc. 1).

## *Analysis*

Under federal law, summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.*

In diversity actions, federal courts apply the substantive law of the forum state. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Hanover Ins. Co. v. Am. Eng'g Co.*, 33F.3d 727, 730 (6th Cir. 1994)). Thus, the parties

agree, and the Court finds, that Kentucky law applies to all claims in this case. (Doc. 32-1 at 16, 24; Doc. 33-1 at 17 n.3).

## A. Breach of Contract

Under Kentucky law, the elements of a breach of contract claim are that: (1) the parties made a valid contract; (2) the contract was breached; (3) the claimant performed under the contract; and (4) the claimant suffered damages as a result of the breach. *Webster & Assocs., Inc. v. EagleBurgmann KY, Inc.*, No. 12-206-WOB-JGW, 2013 WL 6210263, at *5 (E.D. Ky. Nov. 27, 2013) (citing Ky. Prac. Elements of an Action § 4A:1). "[T]he interpretation of a contract is a legal issue for the court's consideration, not the jury's." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 783 (Ky. 2017). However, if there is conflicting evidence, it is a question of fact as to which party breached the contract. *See Schmidt v. Schmidt*, 343 S.W.2d 817, 819 (Ky. 1961); *Harlan Fuel Co. v. Wiggington*, 262 S.W. 957, 958 (Ky. 1924).

Here, the parties do not dispute the existence of valid contracts between them, and Divisions agrees that ValleyScapes "performed at least some services" under those contracts. (*See* Doc. 32-1 at 16; Doc. 33-1 at 18). However, a dispute exists as to which party breached the contracts and whether ValleyScapes is entitled to payment and, if so, how much. (*See* Doc. 32-1 at 20, 23; Doc. 33-1 at 22).

*i.   Oregon Locations*

"'A party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the [nonbreaching party] is still bound by the contract and may not abandon performance and obtain damages for a total breach by the [breaching party], . . . .'" *Stansbury v. Hopkins Hardwoods, Inc.*, No. 4:15-CV-00016-JHM, 2016 WL 3619616, at *7 (W.D. Ky. June 24, 2016) (quoting 23 *Williston on Contracts* § 63:3 (4th ed.)). "However, if the breach is material, the nonbreaching party (1) may treat the contract as at an end, i.e., any duty of counterperformance owed by [it] will be discharged and (2) will have an immediate right to all remedies for breach of the entire contract, including total damages." *Id.* (citing *O'Bryan v. Mengal Co.*, 6 S.W.2d 249, 251 (Ky. 1928)).

"Material terms are those terms essential to the enforcement of a contract." *C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 343 (W.D. Ky. 2012) (citing *Warren v. Cary-Glendon Coal Co.*, 230 S.W.2d 638, 640 (Ky. 1950)). A material breach is "'a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other part[y] to perform under the contract.'" *CMACO Auto. Sys., Inc. v.*

*Wanxiang Am. Corp.*, 589 F.3d 235, 248 (6th Cir. 2009) (quoting *Williston* § 63:3).

"The determination of whether a material breach has occurred is generally a question of fact answered by weighing the consequences of the breach in light of the customs of performance attendant to similar contracts." *Hodak v. Madison Cap. Mgmt., LLC*, 348 F. App'x 83, 90 (6th Cir. 2009) (citing *Williston* § 63:3). Thus, "[w]hether there has been a material breach of the contract is an issue that a fact-finder will be asked to decide, whether that be a judge or jury." *Gulf States Protective Coatings, Inc. v. Caldwell Tanks, Inc.*, No. 3:15-CV-649-JHM, 2018 WL 989545, at *2 (W.D. Ky. Feb. 20, 2018); *see also Micro Indus., Inc. v. Dan Clark Leasing, Inc.*, 129 F.3d 1264 (Table), 1997 WL 720438, at *4 (6th Cir. 1997) ("Generally, whether a breach is material is a question of fact to be decided by the trier of fact.") (citing *Campbell v. Hulett*, 243 S.W.2d 608, 611 (Ky. Ct. App. 1951)).

Further, "[i]n every contract, there is an implied covenant of good faith and fair dealing. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (internal citations omitted). While a breach of this covenant does not create a standalone cause of action, it may serve as the basis for a breach of contract claim.

12

*KSA Enters., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 460-61 (6th Cir. 2019) (citing *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 196 (6th Cir. 2015); *J.S. v. Berla*, 456 S.W.3d 19, 25 (Ky. Ct. App. 2015)). To prove a breach of the covenant of good faith and fair dealing, a "party must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Morris v. Tyson Chicken, Inc.*, 497 F. Supp. 3d 282, 289 (W.D. Ky. 2020) (quoting *KSA*, 761 F. App'x at 461). "'It is not inequitable or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained.'" *Id.* (quoting *Epps Chevrolet Co. v. Nissan N. Am. Inc.*, 99 F. Supp. 3d 692, 703 (E.D. Ky. 2015)).

Here, ValleyScapes admits that it did not use the In Position app to track all of its work at the Oregon locations, but did not report any issues it allegedly experienced to Divisions, and it does not dispute that Divisions hired backup providers for some of those locations.[7] (Doc. 33-1 at 19-21; Doc. 38 at 10-11). However,

---

[7] Although ValleyScapes argues that Divisions "had no grounds to back charge ValleyScapes" for the work performed by additional providers, (Doc. 40 at 8), the 2020 MPA provides that, if Divisions

> shall determine in its sole discretion [ValleyScapes] failed
> to adequately or timely provide any work/services to be
> performed . . . without notice to [ValleyScapes], Divisions
> may provide out-sourced individuals, replacement providers or
> materials, to be indemnified by [ValleyScapes]. . . .

ValleyScapes argues that the "essential purpose" of the contracts in this case was not to operate a smart phone app, but rather to remove snow and ice from commercial properties in exchange for payment and that any deficient services it may have provided did not justify Divisons's bad faith refusal to pay invoices which exceed the expenses Divisions incurred by hiring backup service providers. (Doc. 33-1 at 19-21).

On the contrary, Divisions argues that use of In Position was essential to the enforcement of the parties' contracts because that was the only way it could verify the accuracy of ValleyScapes's billing, which is evidenced by the repeated emphasis on use of the app throughout the contract documents, and that it acted in good faith to resolve the billing disputes after offsetting its own expenses for the backup providers it used at some Oregon Locations. (Doc. 34 at 24-26).

Six Oregon Snow Service Agreements, which were undisputedly part of the parties' contract, provide that "GPS Check-in will be required during each service visit to confirm work performed,"[8] and "[s]ervices performed without proper check in/check out are at

---

Divisions may offset any then-existing or future invoices of [ValleyScapes] as payment or partial payment to cover the cost of replacement providers/materials . . . .
(Doc. 28-2 at 11).

[8] ValleyScapes's manager, Michael Nielsen, has testified that he understood the language in the Oregon Snow Service Agreements regarding "GPS Check-in" to be referring to use of In Position. (Doc. 43 at 11; Doc. 31, Nielsen Dep. at 151:6-14).

risk of not being paid," (Doc. 31-3 at 2, 7, 12, 17, 22, 27), while a seventh specifically required ValleyScapes to "log all services completed per this agreement using Divisions InPosition mobile GPS application while onsite," (*Id.* at 32). Although ValleyScapes now argues that Divisions personnel told it "not to worry" about using In Position to track its work, (*see* Doc. 40 at 5), ValleyScapes's employees have only testified that Divisions told them "to get work done as soon as possible no matter what" regarding one Lowe's store for which Divisions has already paid the invoice. (*See* Doc. 29, D. Webinger Dep. at 254:17-25).

Further, the Oregon purchase orders submitted by Divisions, which ValleyScapes contends are not the ones it previously received, provide that "[l]abor hours will be based off the number of hours on site (with no hour minimum) according to the In Position app," and "[f]ailure to [report issues with In Position] will result in a cancelled job and non-payment." (Doc. 31-4 at 2, 7, 12, 17, 22, 27). Because the 2020 MPA undisputedly applies to the Oregon services, the parties' "Contract Documents" would also include those purchase orders if received by ValleyScapes. (Doc. 28-2 at 2). However, given the inaccurate dates and potentially inaccurate billing methodology on those purchase orders, (*see* Doc. 38 at 3), there is a genuine issue of material fact as to whether those purchase orders are substantively the same as those received

by ValleyScapes, and, thus, there is a genuine issue of material fact as to whether their terms are part of the parties' contract.

Although proper use of In Position would have undisputedly made it much easier for Divisions to perform the important function of verifying the performance of services under the contract, it is disputed whether ValleyScapes's failure to log all of its hours on the app makes it "impossible" for Divisions to perform its payment obligations in a way that is both accurate and fair to its customers. *See CMACO*, 589 F.3d at 248. That ValleyScapes submitted its internal TSheets data does not remedy the issue as a matter of law, given the discrepancies between the data and handwritten time sheets, along with the incomplete and potentially inaccurate GPS logs it contains.[9] (*See* Doc. 34 at 21–22). Thus, a reasonable jury may find that either party's position is correct as to the materiality of the use of In Position to track work hours.

The Court also cannot conclude as a matter of law whether Divisions breached the covenant of good faith and fair dealing. Although the Oregon Snow Service Agreements provided that "Divisions, Inc., in its sole discretion, reserves the right to

---

[9] ValleyScapes's submission of additional TSheets data with its Response in Opposition to Defendant's Motion for Summary Judgment, (*see* Doc. 38-1 at 16–28), only creates further issues as to which set of data, if any, is accurate and raises questions regarding the cause of the differences between the data sets. As such, the Court cannot rely on ValleyScapes's TSheets alone to resolve the dispute as to how many hours ValleyScapes worked as a matter of law.

withhold payments and offset for services not performed or unperformed by [ValleyScapes]," (Doc. 31-3 at 4, 9, 14, 19, 24, 29, 34), Divisions put a hold on ValleyScapes's entire account, which included payments for invoices that exceeded the expenses incurred by the backup service providers in Oregon and for at least some services ValleyScapes undisputedly performed. (Doc. 32-1 at 16; Doc. 33-1 at 20). However, if ValleyScapes materially breached the contract by failing to accurately record its work on In Position, Divisions would have been justified in treating its payment duties for those services as discharged, *see Stansbury*, 2016 WL 3619616, at *7, and its later attempts to resolve the other billing issues by paying the undisputed invoices and verifiable charges after reconciling the offset expenses it incurred would have been in good faith. (*See* Doc. 34 at 25).

Therefore, the Court denies summary judgment as to the breach of contract claim regarding the Oregon Locations.

### ii.  *Washington Locations*

As to the services provided at the Washington Locations, the parties agree that no Snow Service Agreements applied, but that the 2020 MPA governed. (*Id.* at 7; Doc. 33-1 at 18). However, the parties dispute whether Divisions provided purchase orders before or during ValleyScapes's provision of services in Washington. (Doc. 33-1 at 10; Doc. 34 at 7–8). Divisions provided copies of

17

purchase orders for the Washington Locations that were allegedly time-stamped and sent to ValleyScapes via email between 1 and 2 A.M. Pacific Standard Time on February 14, 2021, (Doc. 32-2, Thibodeaux Decl. ¶ 11), several hours before work began at any Washington Location.[10] (*See* Doc. 32-2 at 13-39).

Although ValleyScapes's manager, Michael Nielsen, verified that one email address the Washington purchase orders were sent to belonged to him and another belonged to another ValleyScapes employee, (Doc. 31, Nielsen Dep. at 133:19-134:25), he stated that he was not familiar with any of the purchase orders for the Washington Locations, (*Id.* at 72:17-20), and ValleyScapes's President, Adam Lowery, claimed that ValleyScapes never received purchase orders for the Washington Locations. (Doc. 28, Lowery Dep. at 136:1-6). ValleyScapes correctly notes that there are no actual emails in the record transmitting the Washington purchase orders from Divisions to ValleyScapes. (Doc. 38 at 15).

Just as with the Oregon Locations, there is a genuine issue of material fact as to whether the Washington purchase orders became part of the parties' agreement. The Washington purchase orders contained the same language as the Oregon purchase orders,

---

[10] ValleyScapes argues that the purchase order histories submitted by Divisions are inadmissible hearsay. (Doc. 38 at 15). However, the Court need not decide whether that contention is correct at this stage, as genuine issues of material fact prohibit summary judgment on this issue even if the purchase order histories could be considered.

including that "[t]echnician[s] must check in and out using the In Position app," "[l]abor hours will be based off the number of hours on site (with no hour minimum) according to the In Position app," and "[f]ailure to [report issues with In Position] will result in a cancelled job and non-payment." (Doc. 28-5 at 2, 7, 11, 15, 19, 23). Because the 2020 MPA undisputedly applies to the Washington services, the parties' "Contract Documents" would also include those purchase orders if received by ValleyScapes. (Doc. 28-2 at 2). However, the Court cannot conclude as a matter of law on the present record whether the Washington purchase orders were transmitted and received at the relevant time.

Just as with the Oregon Locations, there is also a genuine issue of material fact regarding whether ValleyScapes's failure to accurately use In Position was a material breach of the parties' contract. *See Gulf States*, 2018 WL 989545, at *2. Proper use of In Position would have unquestionably assisted Divisions in verifying ValleyScapes's performance, and a reasonable jury could find that ValleyScapes's failure to log all of its hours on the app made it impossible for Divisions to perform its payment obligations in an accurate way or defeated an essential purpose of the contract. *See CMACO*, 589 F.3d at 248. Although ValleyScapes's argument that the use of In Position was immaterial is strengthened by the similarity the emergency services at the Washington Locations bear to the emergency services ValleyScapes provided in Bellingham,

19

Washington, in 2019, for which ValleyScapes was not required to use In Position, (Doc. 33-1 at 12), this does not resolve the issue as a matter of law, namely because a jury could find that the purchase orders in this case became part of the parties' contract and explicitly required use of the app to receive payment.

Therefore, the Court also denies summary judgment as to the breach of contract claim regarding the Washington Locations.

### iii. Travel Expenses for Washington Locations

ValleyScapes also argues that Divisions agreed to pay its travel expenses to and from the Washington Locations. (*Id.* at 10). Indeed, in its Answer in this case, Divisions stated that it "agreed to pay for Plaintiff's verifiable travel expenses to and from Washington for [its] services."[11] (Doc. 7 ¶ 15). However, Divisions contends that, much like with ValleyScapes's other work hours, its travel expenses cannot be verified. (Doc. 34 at 23).

Divisions points to ValleyScapes's TSheets, which reflect a total of 53.11 hours of travel between Damascus, Oregon and Vancouver, Washington, which is "nowhere near" the Tacoma

---

[11] In the email in which ValleyScapes's rates for the Washington services were approved, Divisions only listed $375 per hour for a plow as approved regarding travel expenses, (Doc. 25-5 at 2), contrary to ValleyScapes's claim that it is also owed for travel for its shovel crew and skid. (*See* Doc. 28-9 at 13). However, given Divisions's admission that it agreed to pay "verifiable travel expenses to and from Washington," (Doc. 7 ¶ 15), without limitation, its argument that it did not agree to pay such expenses for a shovel crew and skid is not well taken.

locations where services were to be provided.[12] (Doc. 34 at 23; Doc. 30-4 at 3, 6, 9). Although ValleyScapes's invoice reflected 54 hours of travel time, (Doc. 28-9 at 13), which is only 0.89 hours more than what was logged on the TSheets, a genuine issue of material fact remains as to whether the time reflected on the TSheets is actually a "verifiable" representation of ValleyScapes's travel time for the services it provided for Divisions in Tacoma or whether it represents unrelated work in Vancouver.

Thus, the Court finds that summary judgment is also inappropriate as to the breach of contract claim regarding travel expenses to and from the Washington Locations.

### B. Unjust Enrichment

There are three elements a plaintiff must prove to succeed on an unjust enrichment claim in Kentucky: (1) a benefit was conferred upon the defendant at the plaintiff's expense; (2) there was a resulting appreciation of that benefit by the defendant; and (3) there was inequitable retention of that benefit without payment for its value. *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 778 (Ky. 2017) (internal citations omitted).

---

[12] Google Maps shows that Vancouver, Washington is 135 miles away from Tacoma, Washington. Driving Directions from Vancouver, WA to Tacoma, WA, Google Maps, https://maps.google.com (follow "Directions" hyperlink; then choose "Vancouver, WA" as "Staring Point" and "Tacoma, WA" as "Destination").

"Unjust enrichment claims are rooted in equity, and because 'law trumps equity,' courts do not generally allow for unjust enrichment claims where there is already an express contract concerning the benefit conferred." *Triton Servs., Inc. v. Century Constr., Inc.*, No. 2:19-CV-135 (WOB-CJS), 2022 WL 789009, at *10 (E.D. Ky. Mar. 14, 2022) (citing *id.*). Although the Kentucky Supreme Court found that "'the statement that there can be no unjust enrichment in contract cases is plainly erroneous,'" that is only true where "'valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations.'" *Superior Steel*, 540 S.W.3d at 779 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2, cmt. c (2011)).

Here, there is no dispute that a valid contract exists between the parties. (Doc. 32-1 at 24; Doc. 33-1 at 18). Although ValleyScapes argues that it should be compensated for the services it rendered, it agrees that those services are covered under a contract that it has not alleged is ineffective. (*See* Doc. 33-1 at 23). Therefore, ValleyScapes's relevant interests will be adequately protected by its claim for breach of contract and its unjust enrichment claim fails as a matter of law.

22

## C. Promissory Estoppel

Under Kentucky law, "[p]romissory estoppel involves 'a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance and is binding if injustice can be avoided only by enforcement of the promise.'" *Nash-Finch Co. v. Casey's Foods, Inc.*, 762 F. App'x 218, 225-26 (6th Cir. 2018) (quoting *Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009)). However, the Sixth Circuit, applying Kentucky law, has held that "promissory estoppel 'cannot be the basis for a claim if it represents the same performance contemplated under a written contract.'" *Id.* (quoting *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 403 (6th Cir. 2006)); *see also Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 778 (E.D. Ky. 2019) ("[B]ecause promissory estoppel 'is not intended to provide an alternative to a breach of contract claim, where a contract exists on the subject matter of the alleged promise sought to be enforced, a claim for promissory estoppel is not cognizable.'") (quoting *Jan Rubin Assocs., Inc. v. Hous. Auth. of Newport*, No. 2:03-cv-160-DLB, 2007 WL 1035016, at *14 (E.D. Ky. Mar. 30, 2007)).

Indeed, ValleyScapes has recognized that Kentucky law limits promissory estoppel claims to situations in which there is no cognizable breach of contract claim. (Doc. 33-1 at 24). Thus,

because neither party has argued that the written contract in this case is unenforceable or otherwise inapplicable to the services at issue, ValleyScapes's promissory estoppel claim fails as a matter of law.

### E. Additional Discovery

Divisions also argues that it should be permitted to conduct additional discovery under Federal Rule of Civil Procedure 56(d) related to Ryan Ramage ("Ramage"), whose declaration ValleyScapes submitted in support of its Motion for Summary Judgment. (Doc. 35 at 1). Divisions notes that ValleyScapes supplemented its responses to Divisions's First Set of Interrogatories and Requests for Production of Documents to identify Ramage for the first time nearly four weeks after the discovery deadline had passed and the day before filing its Motion for Summary Judgment and Ramage's Declaration in this Court. (Doc. 35-1 at 4; Doc. 35-2 at 6-7).

Ramage is a former employee of Divisions, but his employment ended in September 2019, well before the disputed services in this case were rendered, and thus Divisions had no reason to believe that Ramage would have had knowledge or information relevant to this matter. (Doc. 35-1 at 4-5). ValleyScapes relies on Ramage's testimony in its Motion for Summary Judgment to support its argument that the In Position app had well-known issues and that ValleyScapes was generally "trustworthy" and "honest" with respect

to its work and billing practices. (Doc. 33-1 at 7–8; Doc. 33-4, Ramage Decl. ¶¶ 7, 10, 13). ValleyScapes also relied on Ramage's opinion, as a former District Manager for Divisions, for its argument that "providers like ValleyScapes that do the work properly should be paid regardless of the use, non-use or technical issues during use of the [In Position] App." (Doc. 33-1 at 21; Doc. 33-4, Ramage Decl. ¶ 9).

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." However, here the Court need not decide whether Divisions has shown that it cannot present facts essential to justify its opposition to ValleyScapes's Motion for Summary Judgment.

Based on the above analysis, the Court concludes that, regarding ValleyScapes's breach of contract claim, genuine issues of material fact remain as to whether ValleyScapes committed a material breach, and those issues cannot be resolved at the summary judgment stage based on the opinions of one former Divisions employee who was not involved in the negotiation or drafting of the 2020 MPA and its subordinate documents. Further, the existence

of ValleyScapes's viable breach of contract claim dictates that its unjust enrichment and promissory estoppel claims fail as a matter of law.

Thus, any additional information that could be uncovered regarding the opinions and knowledge of Ramage would not alter the Court's ruling as to the present Motions for Summary Judgment. *See Quartermouse v. Bullitt Cnty. Fiscal Ct.*, No. 3:19-CV-264-DJH-RSE, 2020 WL 12309716, at *2 (W.D. Ky. Aug. 25, 2020) (finding that whether the desired discovery could alter the outcome of a motion is often dispositive in a Rule 56(d) analysis) (citing *Loc. Union 369, Int'l Bhd. of Elec. Workers v. ADT Sec. Servs., Inc.*, 393 F. App'x 290, 295 (6th Cir. 2010)).

Accordingly, this Court denies Divisions's motion to take additional discovery as moot.

### *Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1)  Defendant's Motion for Summary Judgment (Doc. 32) be, and is hereby, **GRANTED** as to Plaintiff's unjust enrichment and promissory estoppel claims, and **DENIED** as to Plaintiff's breach of contract claim;

(2)  Plaintiff's Motion for Summary Judgment (Doc. 33) be, and is hereby, **DENIED**;

(3)   Defendant's Motion to Take Additional Discovery Pursuant to Rule 56(d) (Doc. 35) be, and is hereby, **DENIED AS MOOT;**

(4)   **ON OR BEFORE NOVEMBER 28, 2022,** the parties shall exchange formal settlement proposals; and

(5)   If settlement efforts are unsuccessful, each party shall submit to the undersigned an *in camera* statement of its settlement position **ON OR BEFORE DECEMBER 19, 2022.**


This 8th day of November 2022.



**Signed By:**

**_William O. Bertelsman_** *WOB*

**United States District Judge**